54 CCPA

**Application of Sol D. GERSHON, Melvin A. Goldberg and Oscar W. Neiditch.**

**Patent Appeal No. 7722.**

United States Court of Customs and Patent Appeals.

Feb. 16, 1967.

Eben M. Graves, Allen G. Weise, New York City, for appellants.

Joseph Schimmel, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

ALMOND, Judge.

This is an appeal from the decision of the Patent Office Board of Appeals affirming final rejection of claims 1 to 14 of application serial No. 209,279, filed July 12, 1962, entitled "Fluoride Dentifrice."

The invention relates to a buffered fluoride dentifrice, in the form of either tooth paste or tooth power, comprising at least one fluoride-compatible polish-

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

ing agent; a water-soluble, ionizable, anti-caries fluoride; a buffering agent in an amount sufficient to maintain a pH from 5 to 6 for the dentifrice in saliva; and optionally, a germicide.

Claim 1 is illustrative of the invention and reads as follows:

1. A dentifrice comprising from about 7% to about 80% by weight of at least one fluoride-compatible polish-ing agent; from about 0.01% to about 2% by weight of a water-soluble, ionizable, anti-caries fluoride, calcu-lated as fluoride ion; and from about 0.02% to about 10% by weight of a buffering agent, said buffering agent being present in an amount within the said range sufficient to impart a pH from 5 to 6 to the dentifrice in saliva.

The references relied on are:

Gershon et al.
(Gershon) 2,723,217 November 8, 1955

Gershon
(Australia) 207,489 April 17, 1957

Jordan et al., Journal of the American Dental Association, Vol. 54, No. 5, pp. 589–594, May 1957.

Gershon et al., Drug and Cosmetic Industry, Vol. 82, No. 2, pp. 160, 161, and 251–257, February 1958.

Chemical Abstracts, Vol. 53, entry 3367e, 1959.

———————◆———————

The Gershon American patent is re-lied on as a secondary reference disclos-ing the use of a bactericide, tyrothricin, in a dentifrice. The reference is also of interest in that it discloses the desirabil-ity of buffering "to keep the pH of the dentifrice within the desired range, ap-proximating the neutral point, and pref-erably within the range from 6 to 7." Thus the patent also teaches buffering to maintain the dentifrice pH within the slightly acidic range.

 Chemical Abstracts discloses the known bactericidal activity of hexachlo-rophene, the preferred bactericide or germicide used in appellants' dentifrices. The Patent Office position is that the substitution of hexachlorophene for the bactericide tyrothricin in a dentifrice would be obvious, in view of the afore-said secondary references. In the ab-sence of any evidence or substantial argument to the contrary, we agree with this position. We also note that appel-lants' brief contains the following state-ment:

Prior to appellants' invention it was known that dentifrices containing a water-soluble, ionizable, anti-caries fluoride and a fluoride-compatible polishing agent decrease the solubility of dental enamel. This makes the enamel more resistant to the acid at-tack which occurs in the mouth and thereby reduces the incidence of dental caries. * * *

Thus the issue in this case is whether, in a dentifrice comprising agent, a fluo-ride and a germicide, it would have been obvious under 35 USC 103 to incorporate a buffering agent in an amount suffi-cient to maintain the pH for the claimed composition in the range from 5 to 6 in saliva.

On this issue the Gershon Australian patent, which is primarily directed to a dentifrice composition comprising a wa-ter-soluble fluoride and a mixture of polishing agents, is inconclusive. The reference discloses buffering "the com-positions to within the desired pH range, which is from about pH 5.7 to about pH 7.5." The Patent Office tribunals take the position that a buffered dentifrice having a pH of 5.7 as conventionally measured in water would have only a

slightly higher pH, still within the claimed weakly acidic range of 5 to 6, in the presence of weakly alkaline saliva in the mouth. If the Patent Office may rely on the pH of 5.7 at one extreme of the desired range, we think it is equally fair for appellants to rely on the pH of 7.5 at the other extreme of the range. From a realistic point of view, one of ordinary skill in the art would attach no more special significance to the acidic pH of 5.7 than to the slightly alkaline pH of 7.5. Consequently, we consider this reference to be equally as persuasive of the unobviousness of buffering to maintain the claimed slightly acidic pH range of 5 to 6, and we accord no weight to this inconclusive reference.

The Jordan article contains the pertinent disclosure that, in an abrasive-compatible stannous fluoride dentifrice, "Laboratory evidence indicated that a pH of around 5.0 was most likely to be suitable from the standpoints of stability and effectiveness of stannous fluoride but that this degree of acidity in a control dentifrice (without stannous fluoride) could introduce a real danger to dental enamel under usage conditions." Thus the references considered so far, especially the Jordan publication and the Gershon American patent, indicate the desirability in a dentifrice of a weakly acidic pH ranging from 5 or 6 up to the neutral point (7) and the possibly dangerous effect on dental enamel of a strongly acidic pH, the Gershon Australian patent being inconclusive on the former point, since it equally indicates the desirability of a weakly alkaline pH of 7.5.

The most pertinent primary reference is the Gershon article, which, inter alia, contains the following statement:

Since the solubility of enamel in acid decreased as the pH of the sodium fluoride treatment soultion decreased and the pH of the treatment solution increased during the treatment, additional studies were made in which the sodium fluoride solutions were buffered to minimize pH changes. By

this means, greater reductions in enamel solubility could be expected.
\* \* \*

This statement suffices to show that the greater reductions in enamel solubility obtained during the *in vitro* tests of the buffered dentifrices of appellants' invention in simulated saliva, in comparison with results obtained with unbuffered fluoride dentifrices, were "expected," as distinguished from unexpected, beneficial results. Expected beneficial results are evidence of obviousness of a claimed invention, just as unexpected beneficial results are evidence of unobviousness thereof.

With respect to the desirability of using buffering agents to maintain an *acidic* pH for fluoride dentifrices, Gershon comments as follows:

Since acidic sodium fluoride solutions are more effective than neutral solutions in reducing enamel solubility and buffered solutions exhibit maximum activity, it would be logical to use buffered, acidic sodium fluoride solutions for topical applications. \* \*

We agree with the logic of this position, which renders obvious the practical use of buffered acidic fluoride dentifrices in general. As for the specific slightly acidic pH range of 5 to 6, figure 1 of the Gershon article graphically portrays the facts that, as summarized in the article, "[b]uffered acidic fluoride solutions are more effective in reducing enamel solubility than unbuffered solutions," and that the maximum slope of the curve occurs between pH 5 and 6, when percent reduction of solubility is plotted against pH as in figure 1. Better results are obtained for the 5 to 6 pH range than for the nearly neutral 6 to 7 range. It is also true that even better reductions in enamel solubility are obtained for buffered fluoride solutions in the pH range of 4 to 5. However, the point of diminishing returns, in terms of increased percentages of solubility reductions as the pH values are lowered, is reached at the point where the slope of the curve is maximized, and

the locus of this point is in the claimed pH range between 5 and 6. Thus, further decreases in pH below 5 would increase the percent reduction in enamel solubility according to the results of the *in vitro* tests reported by Gershon, but this would also involve the corresponding risk that, as stated by Jordan et al. in their article reporting the results of clinical testing of a fluoride dentifrice, "this degree of acidity * * * could introduce a real danger to dental enamel under usage conditions."

For the above reasons, we think the cited art clearly suggests that the most desirable pH range for a buffered acidic fluoride dentifrice would be the claimed slightly acidic range of 5 to 6, rather than a more strongly acidic, and possibly dangerous, range of, say, 4 to 5 or a nearly neutral, and less effective, range of 6 to 7. The use of a buffering agent in an amount sufficient to maintain this most desirable pH range of 5 to 6 for a fluoride dentifrice in the presence of the slightly alkaline saliva which is normally present in the human mouth is obvious in our opinion from the teachings and clear suggestions of the prior art, especially the Gershon article.

Appellants argue that they were first to recognize the problem that fluoride dentifrices having a desirably acidic pH of less than 7 as conventionally measured in water have unsatisfactorily low RES (reduction in dental enamel solubility) values in saliva compared to their RES values in water. Since appellants were the first and only ones to recognize this problem, it is further contended that they naturally were also first to determine its cause, namely that alkaline saliva raises the pH of an unbuffered dentifrice in the mouth to undesirable values over 6. Finally, appellants urge that only after recognition of the problem and its cause were they then able to solve the problem by buffering fluoride dentifrices with a buffering system in amounts adequate to maintain a pH of 5 to 6 in saliva, hence achieving relatively high RES values of 27 to 42%.

Since appellants stress that they were first to recognize a problem which allegedly has still not been recognized by others ordinarily skilled in the dentifrice art, one may question whether in fact such a "problem" objectively existed, as distinguished from its acknowledged subjective existence in the minds of the inventors and their patent counsel. Even if the problem did objectively exist in fact, the absence of discussion of it in the cited art may be due to a variety of factors. As we pointed out in In re Goodman, 339 F.2d 228, 232, 52 CCPA 895, 900:

> The failure of the prior art to mention a problem may be due to the fact that in practice the problem is not a serious one or that a large number of satisfactory solutions is readily apparent.

Since the alleged problem in this case was first recognized by appellants, and others apparently have not yet become aware of its existence, it goes without saying that there could not possibly be any evidence of either a long-felt need in the dentifrice art for a solution to a problem of dubious existence or failure of others skilled in the art who unsuccessfully attempted to solve a problem of which they were not aware. Accordingly, no evidence of such relevant "secondary considerations" tending to prove unobviousness is in the record before us. See Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545.

■ Although the cited prior art does fail to disclose or suggest either the existence of appellants' problem or its cause, we cannot agree that the art does not teach or suggest a solution to the problem. The cited art, especially the Gershon article, unquestionably teaches the superiority of "buffered acidic fluoride solutions" in effectively reducing dental enamel solubility *in vitro*. We think that one of ordinary skill in the dentrifice art would thus be persuaded to use buffered acidic fluoride dentifrices for the purpose of reducing dental enamel solubility *in vivo*. Such obvious

use of buffered dentifrices would *inherently* provide a solution to appellants' problem, even though an adequate theoretical explanation of the reason why incorporation of buffering agents in acidic fluoride dentifrices achieves superior RES values is not found in the cited art. We think it is sufficient that the prior art clearly suggests doing what appellants have done, although an underlying explanation of exactly why this should be done, other than to obtain the expected superior beneficial results, is not taught or suggested in the cited references.

We find no reversible error in the decision of the Board of Appeals holding the claimed subject matter to be obvious and unpatentable under 35 U.S.C. § 103. Accordingly, the decision of the board is affirmed.

Affirmed.

SMITH, J., concurs in the result.